**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**BENJAMIN PHARES,**
          **Plaintiff,**

v.                                                                    **CIVIL ACTION NO. 3:07CV90**

**MICHAEL J. ASTRUE, COMMISSIONER OF**
**SOCIAL SECURITY,**
          **Defendant**.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Benjamin Phares ("Plaintiff") filed his current application for DIB on March 11, 2005,

alleging disability as of December 15, 2003, due to herniated discs, constant back pain, nerve

damage, carpal tunnel, and tennis elbow (R.11, 112, 131, 141).[1] His claim was denied at the Initial

and Reconsideration levels (R. 78, 79). Plaintiff requested a hearing, which Administrative Law

Judge ("ALJ") Donald McDougall held on October 23, 2006 (R. 23). Plaintiff, represented by

---

[1]The record indicates Plaintiff filed a previous application for DIB on April 12, 2004, also
alleging disability since December 15, 2003 (R. 108). This claim was denied at the Initial level
and was not appealed. According to the ALJ's Decision, Plaintiff filed previous applications on
December 15, 1989 (SSI- onset date December 2, 1988); December 31, 1991 (SSI – onset date
December 1, 1991); and August 1, 1995 (DIB and SSI – onset date October 15, 1992) (R. 11).
These applications were dismissed at the hearing level on April 23, 1997, due to abandonment of
claim. Id.

counsel, testified along with Vocational Expert Eugene Czuczman ("VE"). The ALJ rendered a decision on January 19, 2007, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 24). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 3).

## II. Statement of Facts

Plaintiff was born on February 2, 1961, and was 45 years old on the date of the ALJ's decision (R. 19, 108). He has a high school education and past work as a laborer in the construction industry (R. 142, 144). He last worked in December 2003.

According to a report of an Independent Medical Examination on October 23, 2003, Plaintiff stated that on February 21, 2002, he was performing his usual job as a construction laborer when he was asked to assist with the demolition of a glass factory. He stated he was tasked with picking up a piece of fire brick, estimated as 4x2 feet and 120 pounds (R. 199). He picked it up, turned to walk over and put it in a front-end loader when he had a sudden onset of low-back pain. He went home and the next day was unable to walk. He wanted to go to work anyway, so his family "actually had to drag him on a blanket out to his vehicle and put him in his vehicle." He spent two hours at work leaning on his shovel, was unable to move, and was sent to the doctor.

Plaintiff presented to the hospital on March 3, 2002, for back and neck pain due to a "low back injury at work" (R. 201).

Plaintiff presented to Dr. Hahn on March 5, 2002, complaining of "a little bit of back pain," which he injured "at work." He was using oxycodone.

An MRI dated March 7, 2002, revealed a moderate transverse herniation of the nucleus

pulposus with more compression of the neural foramen on the left and mild narrowing of the spinal canal at L4-5, and a small herniation at L3-4 with no major focal mass effect demonstrated (R. 200). On March 26, 2002, Plaintiff was doing somewhat better after steroids (R. 201). Dr. Hahn wanted Plaintiff to be off work for two more weeks, then return to work without lifting for another two weeks.

On April 3, 2002, Plaintiff underwent a psychological evaluation (R. 203). The psychologists found Plaintiff was in no significant psychological distress, and it appear[ed] that he had decided to stay at home and give up his work doing carpentry. Dr. Gross concluded that Plaintiff had "settled into a disabled lifestyle with basic needs met and was unlikely to respond favorably to interdisciplinary treatment in general and was in need of psychological services."

On April 9, 2002, Dr. Hahn diagnosed herniated disk with light duty for two weeks (R. 201). He gave Plaintiff Celebrex and referred him to a neurologist.

Plaintiff presented to neurologist Mohammad Shafiei, M.D. on May 1, 2002 (R. 230). Plaintiff complained of recurrent neck pain and recurrent lower back pain radiating into his hips and shoulders. The pain between his shoulders "incurred a numbing sensation and down his arms and especially in his left arm and hand." Plaintiff told Dr. Shafiei that he was lifting something heavy at work on February 21, 2002, and felt severe neck and lower back pain. He was seen by his family physician, Dr. Hahn. An MRI revealed several disc bulges. He was given Celebrex. He described his pain and discomfort increased to the point he had to stop working on March 1, 2002. He noted no significant improvement since. He was taking no medications (R. 230).

Upon examination Plaintiff had positive straight leg raising; his cervical and lumbar paraspinal muscles were extremely tender to touch, cervical and lumbar flexion was markedly

limited, and cervical flexion induced subjective parasthesia in both upper extremities (R. 231). Tinel was positive in both wrists. Decreased sensation to pin prick was noted involving the L4-5 dermatomes and right median nerve distribution.

Dr. Shafiei diagnosed posttraumatic cervical and lumbar paraspinal muscle strain, rule out cervical and lumbar radiculopathy, and possible right carpal tunnel syndrome (R. 231). He requested a cervical spine MRI and electrodiagnostic studies, and prescribed Ativan and Maxidone.

The MRI of the cervical spine on June 12, 2002, showed a small transverse herniation of the nucleus pulposus flattening the anterior aspect of the thecal sac, with mild compression of neural foramina and mild narrowing of the spinal canal (R. 229). The electrodiagnostic studies indicated lumbar radiculopathy of L4-5, more pronounced on the left, and right carpal tunnel syndrome (R. 226, 228).

At a follow up visit, Dr. Shafiei prescribed oxycontin, maxidone, Ativan and zanaflex and "strongly advised" Plaintiff to "practically stay in bed for at least ten days" (R. 224). Dr. Shafiei found Plaintiff's prognosis unfavorable. Surgical intervention was not indicated, but the doctor "doubt[ed] very much that he will ever be able to return to construction work." Plaintiff was to gradually increase his physical activities, and physical therapy would be considered in the near future. He was to continue wearing his back brace, especially at night.

At a follow up visit on August 12, 2002, Plaintiff told Dr. Shafiei he "was doing much better until he started doing some work around the house" (R. 224). For the past two weeks he was again in severe pain. He had been scheduled to attend physical therapy but attended one session "and could not walk for four days." The doctor again advised Plaintiff to avoid excessive physical activity at this time.

At a follow up visit on October 2, 2002, Plaintiff told Dr. Shafiei he felt fine as long as he took his medications (R. 223). He had been trying to do some physical work around his house. Upon examination, the lower lumbar paraspinal muscles remained tender to the touch and lumbar flexion was still limited at 30 degrees. Dr. Shafiei refilled Plaintiff's Bextra, Zanaflex, Ativan, Neurontin, and Maxidone.

Plaintiff followed up with Dr. Shafiei on December 17, 2002, reporting that he had started doing some physical work around the house, but in the past week had been in severe pain to the point of having difficulty moving around (R. 223). Upon examination lower lumbar and cervical paraspinal muscles were extremely tender to touch. His medications were renewed, and the doctor advised Plaintiff to "go slow and increase his physical activities gradually."

On February 6, 2003, Plaintiff underwent an IME performed by Dr. Russell at the request of the agency (R. 202). Dr. Russell was "very concerned about the clinical picture [Plaintiff] presented," and concluded that "the examinee, has, in my opinion, been generally misinformed, misdiagnosed, and improperly treated over the past 10 months." He recommended Plaintiff's transfer to a physiatrist or other physician skilled in treating musculoskeletal complaints. He found Plaintiff's overall prognosis was fair, but noted Plaintiff had "unfortunately" been "treated in a rather disabling manner in the past." Dr. Russell diagnosed low back pain, chronic lumbar degenerative disease and "symptom magnification" (R. 202).

Plaintiff followed up with Dr. Shafiei on February 26, 2003, reporting a lot of neck and low back pain and increasing stiffness of his neck, "especially in this cold weather" (R. 223). He continued to ambulate with a slight limp, and his lower cervical and lumbar paraspinal muscles remained markedly tender to touch. Dr. Shafiei renewed Plaintiff's medications.

Plaintiff followed up with Dr. Shafiei on April 29, 2003, reporting that he generally felt a lot better some days, but due to "excessive physical activity" he had some pain and discomfort at night (R. 222). Dr. Shafiei found Plaintiff's condition improved and maintained him on Bextra and Klonopin, advising him to return in five months.

Plaintiff followed up with Dr. Shafiei on September 16, 2003, reporting he had returned to work (R. 222). He reported that after work he usually experienced severe low back pain. Lorcet worked very well and he was able to get up and move again, but otherwise he noted no significant change. He was diagnosed with traumatic chronic low back pain and continued on Bextra and Klonopin. He was given a prescription for Lorcet to be taken only when absolutely needed.

On a Medical Questionnaire dated October 24, 2003, Plaintiff reported his hobbies as farming, raising horses and cattle and hogs, working, and sometimes fishing (R. 212). He said he used to hunt but no longer could.

On October 24, 2003, Dr. Charles Werntz, III, DO, MPH performed an Independent Medical Examination ("IME") of Plaintiff (R. 199). Plaintiff reported the injury history recited above. He also reported a "rather involved course of medical care including details he is not able to precisely recall," but he reported he had an EMG, CT scan, and an MRI. He had physical therapy for several weeks with minimal changes. He reported that he was off work for approximately one year during this time before he finally got to the point where he just felt he had to return to work. He related that he kept a farm where he raised hogs, horses, cattle, rabbits, and several kinds of exotic animals that were raised by his wife. He was currently using either Bextra or a Lorcet 10/650 once or twice a week with good results. He had returned to work and continued to work as a construction laborer, "although he reports he has now moved to the Morgantown area and is doing residential construction

in accordance with his moving to the Kingwood area for his farm."

Plaintiff told Dr. Werntz that he had not had too much trouble with his return to work, although at night his legs would "occasionally twitch and ache." He also reported discomfort at the base of his neck, which "hurts and get stiff," plus pain in his low back "but only with squatting down." He reported a circumferential "pins and needles" sensation from his low back into his legs bilaterally. He wore a low-back brace "when working or doing heavy lifting at home, but not at other times."

Upon examination, Plaintiff had clearly demonstrable areas of spasm in his neck (R. 200). He was tender to palpation over the lower lumbar region at L5, which was tender. He had some paraspinal tenderness but no spasm. He had decreased sensation to pinprick in the L5 dermatome at the thigh, knee, mid calf, and foot. Straight leg raising sitting was negative at 90 degrees bilaterally, but supine was positive at 46 degrees left and 37 degrees right (R. 216).

Dr. Werntz diagnosed lumbar strain/sprain and cervical sprain/strain and cubital tunnel syndrome status post surgical release (R. 203). He concluded that Plaintiff was injured at work which injury was not an aggravation or recurrence (R. 203). He opined that Plaintiff was treated for a period of time "by a rather disabling physician," stating: "I was rather shocked to note in his initial evaluation that he thought he had a very poor prognosis and was very unlikely to return to work and was counseling the patient as such." He did not feel any further treatment was necessary, although he told Plaintiff he might benefit from some massage for his neck/shoulder. He did not believe Plaintiff needed to formally reenter the medical care system. He had been working throughout the 2003 construction season. He was currently performing full duties of a construction laborer including heavy equipment operation. The only concession was that he wore a back brace when

operating heavy equipment or using vibration-producing equipment. He had some difficulty lifting very heavy weights, so he had somebody help him with that, which the doctor noted was "probably a good recommendation for all workers." Dr. Werntz rated Plaintiff at an eight percent whole person impairment for his cervical spine and 12 percent impairment for the lumbar spine, for a total of 10 percent overall impairment.

On March 18, 2004, Plaintiff presented to Dr. Shafiei, reporting that "after a few weeks of returning to work he was told that there was no light duty work for him and he was placed on regular work." This caused significant exacerbation of his low back pain. He started experiencing pain and numbness radiating to his right hip and leg. He ultimately quit work in December 2003. He also stated that workers' compensation did not authorize his medications and he had been without any pain medication since December (R. 221). Plaintiff told the doctor, however, that he was willing to pay for his medications.

Upon examination, Plaintiff ambulated in a semi-flexed posture and his lumbar paraspinal muscles were tender to the touch. Dr. Shafiei again diagnosed post traumatic chronic low back pain. He recommended referral to a pain management program and gave Plaintiff prescriptions for Klonopin and Lorcet and samples of Bextra.

On July 20, 2004, Plaintiff presented to Russell Biundo, M.D. for a State agency disability examination (R. 232). Plaintiff complained of pain primarily in the cervical spine. Dr. Biundo noted that Plaintiff's x-rays, MRI, and CT scans were "unremarkable." Plaintiff said Bextra, Zanaflex, and Neurontin were not helpful, but Lorcet was. Plaintiff "remained independent in all areas. He helps raise horses and he stays active as best as he can." He ambulated without an assistive device and did not use any orthosis. He was not working and did not feel he could go back to his old type

of work. He did "have a lot of acreage at home and he was doing a lot of farming. However, he is not going to try to do heavy farming any longer. He will try to go back to maybe light farming."

Plaintiff described his symptoms as his legs twitching a little bit and having a lot of pain and discomfort associated with his muscles being tight and sore (R. 233). He had no difficulty with burning with urination, although he sometimes had frequent urination. He had no difficulties with bowel or bladder function. He denied any severe depression, anxiety "or anything like that."

Upon physical examination, range of motion of the cervical spine lying down was completely within normal limits as was passive range of motion (R. 233). Muscle strength was normal, reflexes were slightly decreased, more so in the lower extremities, sensation was intact, and there was no tremor or atrophy and no abnormal movements. Reflexes were normal. Lumbosacral spine range of motion was within normal limits, with perhaps slightly limited range of motion in lateral flexion. He had a "tendency to feel tight across his thoracic and cervical paraspinals." Dr. Biundo assessed "most likely myofascial pain" (R. 233). He suggested therapeutic intervention and conservative treatment. Plaintiff noted he would stay active, but did not think he would be going back to work. He said his muscles got really tight and sore, even from moderate activity. Dr. Biundo found Plaintiff was neurologically intact, with no evidence of cervical deformities of the thoracic or lumbosacral spine "at all." A Range of Motion form completed by Dr. Biundo indicated all ranges of motion were normal (R. 234).

A State agency physician completed a "Physical Residual Functional Capacity Assessment" on August 2, 2004, opining that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday, and had no other physical limitations.

On August 17, 2004, Plaintiff presented to Dr. Shafiei, continuing to complain of severe low back pain (R. 246). Plaintiff said that since his last appointment he had changed jobs four times. He was usually able to do some work for a few days, but then his back would "give up" and he was unable to move and had to spend a lot of time in bed. He was recently fired from his recent job and applied for disability but was turned down.

Plaintiff ambulated in a semi-flexed position. His lumbar paraspinal muscles remained markedly tender to the touch and range of motion was markedly limited at the lumbar spine and hips. Dr. Shafiei diagnosed status post traumatic lumbar paraspinal muscle spasm, status post traumatic lumbar radiculopathy, and status post traumatic lumbar spine degenerative disc disease. Plaintiff was given a prescription for Limbitrol, and was to continue with Bextra and Ultracet. Dr. Shafiei opined that Plaintiff was "totally and permanently disabled and will never be able to return to construction work." (R. 246).

Plaintiff presented to Dr. Shafiei on December 9, 2004, reporting severe pain in his left shoulder, pain radiating from the left side of his neck to his left hand, and increasing weakness of his left hand starting a few weeks earlier (R. 245). He stated he had been under a lot of stress recently since his 17-year-old son was killed in a fight and he lost his newborn granddaughter to SIDS. Upon examination, range of motion was markedly limited at the left shoulder, and the left shoulder girdle muscles were tender to touch. Dr. Shafiei diagnosed status post lumbar spine degenerative disc disease and lumbar radiculopathy, rule out cervical radiculopathy. Plaintiff was to continue with his current medications – Limbitrol and Ultracet – with the addition of Xanax "for his severe anxiety."

Plaintiff filed his current application for DIB on March 11, 2005, alleging he became disabled on December 23, 2003.

On June 14, 2005, Plaintiff presented to Dr. Kathleen Monderewicz, M.D. for an examination arranged by the State agency (R. 247). Plaintiff told the doctor he had developed neck and low back pain in February 2000, when he was loading some heavy blocks at work. He was turning to put a block in a load and "felt a pinch at the base of his neck." He said he had x-rays of the lumbar spine but never had any of his neck. He tried to go to work but was unable to work the next day. He was put on bed rest and then physical therapy, and then returned to work until 2003, when he said "his employer told him that he was unable to work any longer because his neck and back problems prevented him from doing his job." Plaintiff said he had chronic low back pain but "most of his problems are due to the neck pain." It increased with turning his head or moving his head up and down. The pain was helped with heat. He felt frustrated because "even though he feels his neck pain is more severe than the low back pain, prior medical evaluation has focused on lower back and he states he has never received any imaging studies of the neck, including x-ray, CT scan, MRI or myelogram and no EMG study of the upper extremities."

Plaintiff reported no change in bowel habits, or urgency, frequency, dysuria or hesitancy in urination (R. 249). He ambulated with a left limp and held his neck very stiffly while ambulating and sitting. He was uncomfortable supine due to neck pain. He did not require a handheld assistive device. He was comfortable sitting.

Upon examination, the shoulders, elbows and wrists were nontender with no redness, warmth, swelling or nodules. Flexion and abduction of the right shoulder was normal, but the left shoulder was limited to 110 degrees flexion and 90 degrees adduction. All other testing was normal

11

with the exception of positive Tinel and Phalen sign in the left wrist. Grip strength was 44 on the right and 23 on the left, but Plaintiff could write with his right hand and pick up coins with either hand without difficulty.

The dorsolumbar spine had normal curvature (R. 250). There was tenderness from L3 to the sacrum. Straight leg raising was normal both sitting and supine. He could stand on one leg at a time without difficulty. Forward flexion at the waist was limited, as was lateral flexion. There was no hip joint tenderness but Patrick testing was positive. Plaintiff had stiff, slow hip movement with complaints of pain. He could walk on his heels and toes, and walk in tandem gait without difficulty. Squatting was decreased due to back pain. The doctor referred Plaintiff for x-rays of the lumbar spine which showed slight narrowing of L5-S1 (R. 153). She diagnosed chronic neck pain, chronic low back pain, and possible left carpal tunnel syndrome (R. 251).

A State agency Medical Consultant, Dr. J.T. Ruiz, completed a physical RFC of Plaintiff on August 15, 2005, finding that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 255). He was limited to occasionally climbing ramps/stairs, stooping, crouching or crawling; frequently balancing and kneeling; and could never climb ladders, ropes or scaffolds (R. 256). He was limited to occasional overhead reaching and occasional handling with the left hand, and frequent feeling with the left hand (R. 257). He could constantly handle and feel with the right hand, and finger with both hands.

At the Administrative Hearing held on October 23, 2006, Plaintiff was represented by an attorney (R. 23). He testified that he lived on a 24-acre farm he and his wife had bought the year before (R. 25). They had had up to 13 veal calves on the farm at one time, but did not have them any

more because Plaintiff could no longer grow hay and do what he had to do to care for them. He testified they got rid of the calves the past spring. Since that time, the land was only used by his sons for squirrel hunting, camping, and riding their four-wheelers, and by his wife who "has three horses on it that she takes care of for her own personal projects." (R. 26).

When asked about the $8,000.00 in reported income for 2004 (after his alleged onset date), Plaintiff testified he and his wife sold all the livestock off, and sold some of the property to his son (R. 28). He testified they had been starting their own farming business, with tax numbers, and USDA permits, and "just took that money and put it in as income for —what we made off of it." When asked about the $11,000 he reportedly made in 2005, Plaintiff testified he went back to work with contractor Worcester and Eisenbrandt, "because we ran out of money. We had no way of paying our bills, no way of buying no groceries. It was - - things was really coming down on us" (R. 28). He testified he then went back to his doctor and told him he had to go back to work because disability had turned him down. He then went back to work, but "just couldn't keep up with the lifting, my arm being numb. I was dropping things. I was a hazard to myself. And then, I missed two weeks, because I couldn't, I couldn't even get to the toilet." His employer replaced him, stating, "if you can't come back full duty and full health, then we just can't use you." He testified he had worked as Lead Carpenter for the firm for four to five months. He had been looking for jobs, but the construction companies all told him they couldn't guarantee that he would not have to lift, and could not guarantee him light duty work on a heavy civil construction job (R. 30).

Plaintiff testified he became disabled in December 2003, when he picked up a 200 pound fire block and went to toss it in an endloader (R. 32). When he did he "went to the floor [and] couldn't move [his] legs." They put him in a chair and he sat there for an hour or so, but couldn't stand up

because his legs wouldn't work. He came back the next day and leaned on a shovel, but the boss told him he had to go to the doctor (R. 32-33). He testified that his ability to work was affected because he could work two or three days, and then his back would go out, his arms were constantly numb, and he could not hold onto anything– was dropping stuff. Then he would "miss X amount of days because [he couldn't] get out of bed." He was then replaced at work. Plaintiff testified that had "been telling them [his doctors] since I went to the doctor the first time. . . most of [his] problems is in my upper back, and my neck. I get tingling. My arms hurt now." He said that his lower back gave him problems, but that was something he could live with. But his shoulders, upper neck, tingling in his arms, and hip pain was his real problem. He was no longer taking any pain medication because workers' compensation stopped paying, and he just couldn't afford the pills, also stating, however: "And I'm not a pill person anyway. I don't like to rely on pain [pills] . . ." He did testify that the pills worked and made him feel like he could get out and do things, but when they wore off, he would have to take them again immediately, which he believed was "just covering up the problem."

Plaintiff testified he could only lift 20 to 25 pounds continuously (R. 38). He testified he tried to bail hay the other day and it "put him in the bathtub for four hours." When asked how he was bailing hay, he said that his boys hadn't shown up, and his wife was moving hay for her horses. He walked across the field and grabbed a bail of hay and tossed it over on the wagon. The bail weighed about 60 pounds. He "about cried" and it "put him in bed for the rest of the day."

Plaintiff testified his last doctor visit for any evaluation or treatment was in December 2004 (R. 42).

When asked if he had any medical conditions other than his spine, Plaintiff said no, but said

14

he had "problems with my bowels and stuff now. Dr. Shafiei said that that would come later. I mean, it - - nerves - - something about nerves. I couldn't explain it to you in detail. But other than that, I feel healthy . . . ." (R. 44). His bowel problem had started in the last year but he never saw any doctor for it, because he just could not "get another bill started."

Plaintiff explained his daily activities as waking up in the mornings, feeling "nothing but pins and needles, numb." His wife helped him get out of bed or he rolled over onto the floor then knelt to get up. He would then get up and take a hot shower until he was loosened up. He continued:

> And then, I'll go out with her and try to do what I can do, do with her. As soon as I start doing a bunch of lifting, or anything where I have to really strain to lift heavy, I'm done for days. I'm on the couch, I'm in a hot tub, I got hot towels wrapped around my neck. But, I do try to do a little laundry when I can.

Plaintiff also used the microwave and dishwasher. He used to have an acre-and-a half garden but could not keep up with the weeding and hoeing. He mowed the lawn one time but it "about jarred me to death." He fed his wife's birds and took care of them. His wife had turkeys and guineas outside, and exotic birds inside - -parrots and cockatiels (R. 47). He was an avid reader. His hobby at the moment was trying to figure out his computer, because he was thinking about trying to sell things on eBay. He testified:

> You know, I can sit in front of the computer. If I get - - my legs get to bothering me and I get numb, I can stand up and still see the computer. Or, I can walk back and forth from the sides, but I've been checking into trying to get into eBay, selling over eBay, and selling for other people for commission over eBay.

When asked by his counsel, Plaintiff testified that his upper back and neck bothered him the most (R. 51). On a scale of 1 to 10, 10 being the worst pain, he testified his lower back was a 2 and his neck a 5 or 6. He had no medications. He testified that "they keep checking my lower back," but his lower back didn't bother him that bad. His neck was what "tore him up" and made him

"want to cry."

The ALJ then asked the Vocational Expert ("VE") if there would be any jobs available in West Virginia for a person of Plaintiff's age, education, and work experience, limited to the light exertional level, with a sit/stand option, being able to change positions briefly at least every half hour. There could be no climbing ladders, ropes scaffolds, stairs or ramps; no more than occasional balancing, stooping, kneeling, crouching or crawling; and no more than occasional use of the left hand and arm. The VE responded that there would be a significant number of jobs available for the hypothetical individual, including information clerk, inserting machine operator, and photographic machine operator. He also testified that there would be sedentary jobs with the same limitations, including machine monitor, laminator, and type copy examiner (R. 66). The ALJ asked, and the VE testified his testimony was consistent with the DOT. He also testified a person could miss two days a month and still retain the jobs he named.

When asked if he had applied for a State medical card, Plaintiff testified "Not yet. I, I need to. You're right and I am wrong. And I do apologize, but I just have a problem going in there and asking for something that I don't think I deserve or I need." (R. 71).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.      The claimant is assumed to have not engaged in substantial gainful activity (SGA) since December 15, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*)

3.   The claimant has the following severe impairment: vertebrogenic disorder (20 CFR § 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work; with the ability to briefly (one or two minutes) change positions at least every 30 minutes; no climbing of ladders, ropes, scaffolds, stairs or ramps; no more than occasional balancing, stooping, kneeling, crouching or crawling; no more than occasional use of the left, non-dominant hand or arm for grasping or fine fingering; and an allowance to miss up to one day of work per month.

6.   The claimant is not able to perform any of his past relevant work (20 CFR § 404.1565).

7.   The claimant was born on February 2, 1961, and was 42 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR § 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.  The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g)).

(R. 11-19).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.  The Administrative Law Judge failed to properly develop the administrative record;

2.  The Administrative Law Judge erroneously relied upon the testimony of the Vocational

Expert; and

3.     The Administrative Law Judge erroneously evaluated the plaintiff's subjective complaints.


Defendant contends:

1.     The ALJ did not abuse his discretion by not ordering a third consultative physical examination;

2.     Substantial evidence supports the ALJ's Residual Functional Capacity determination and the corresponding hypothetical question to the Vocational Expert; and

3.     Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints of disabling functional limitations were exaggerated.

## C. Subjective Complaints and Credibility

The undersigned will first address Plaintiff's argument regarding the ALJ's credibility determination. Plaintiff argues that the ALJ erroneously evaluated his subjective complaints. Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints of disabling functional limitations were exaggerated.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be

expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ found that Plaintiff met the first, threshold, step under Craig, in that he had medically determinable impairments that could reasonably be expected to produce the alleged symptoms. The ALJ was therefore required to consider "all the available evidence," including that listed in the second step of the evaluation. A review of the decision shows the ALJ did take into account Plaintiff's statements about his pain, his medical history, medical signs, and laboratory findings, objective medical evidence of pain, his daily activities, specific descriptions of the pain, and medical treatment taken to alleviate it.

Plaintiff, however, argues first that, "while the Administrative Law Judge indicated that the Plaintiff's statements were not 'entirely credible,' his rationale fails to mention even one statement which he found to be not credible. Thus his credibility analysis defies review." The undersigned finds this argument without merit, not finding any law which requires that the ALJ specify each of

a claimant's statements he believes are not credible, and explain why each is not credible. Here the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effect of [his] symptoms not entirely credible," and, as found above, took into account all the available evidence to support that finding. The undersigned finds this procedure sufficient under the Regulations, Rulings, and case law.

Plaintiff next argues that the ALJ relied on his work record, but "failed to explain how a 'spotty' work record indicates that complaints of pain are not supportable." Again, the undersigned finds this argument without merit. The ALJ clearly explained that Plaintiff's work record before his alleged onset date showed some earnings in most years, but "with over half the years since age 18 at less than SGA [substantial gainful employment] level of earnings. Actually, the two years since the alleged onset date are among the higher years of earnings." There is no error in the ALJ's statement of fact. The earnings record shows that, over a period of 26 years, Plaintiff made more than $10,000 in only five years. He made less than $5000.00 in 15 years, including eight in which he reported less than $1,000.00 each. Plaintiff had earnings presumptively qualifying as substantial gainful employment in only 10 out of 26 years. As the ALJ correctly stated, one of those years was actually <u>after</u> his alleged onset date. 20 CFR § 404.1574. Plaintiff does not cite any law to support a finding that the ALJ erred by considering his work history. Social Security Ruling ("SSR") 96-7p specifically provides that the ALJ must consider statements about, among others, the individual's prior work record. Although the undersigned could find no Fourth Circuit case on point, the Second Circuit's holding in <u>Schaal v. Apfel</u>, 134 F.3d 496 (1998) is instructive. In that case, as here, the plaintiff argued that the ALJ erred by pointing to her poor work history as a basis for not crediting her testimony in full. <u>Id.</u> at 502. The court held as follows:

SSA regulations provide that the fact-finder "will consider all of the evidence presented, including information about your prior work record." 20 C.F.R. § 416.929(c)(3). Moreover, ALJs are specifically instructed that credibility determinations should take account of "prior work record." SSR 96-7p . . . . There is no suggestion in SSA regulations that an ALJ may only consider favorable work history in weighing the credibility of claimant testimony. Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well.

Id.

In Winters v. Barnhart, 2003 WL 22384784 (N.D.Cal. 2003)(unpublished), the Northern

District of California cited with approval the Second Circuit's holding in Schaal, finding that " the

fact that Winters has not worked in over 20 years can be used as a factor in finding her not credible."

The undersigned likewise finds the ALJ did not err in considering Plaintiff's work record,

or in finding that his work history was "spotty" and negatively impacted on his credibility regarding

his ability and desire to work.

Plaintiff next argues that the ALJ erred by considering his lack of significant treatment in

determining his credibility. Again, SSR 96-7p specifically provides that the ALJ shall consider

medical treatment a claimant sought to alleviate his symptoms. Here, the ALJ correctly noted that

Plaintiff had not had not had significant treatment for his back other than medication, and had not

sought any evaluation or treatment for any of his alleged impairments for nearly two years. Plaintiff

argues that he "has not had insurance for a significant period of time, and has been unable to afford

treatment . . . ." In Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit held:

It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.

SSR 96-7p, however, provides:

The explanations provided by the individual [regarding his lack of treatment] may

provide insight into the individual's credibility. For example: .... the individual may be unable to afford treatment **and may not have access to free or low-cost medical care . . . .**

(Emphasis added). Here, Plaintiff, who was represented by counsel, admitted he had not even tried to get a State medical card, and there is no evidence he attempted to obtain free or reduced-price examinations, medical care, or medications. In March, 2004, Plaintiff complained to his doctor that Workers' Compensation had not authorized his medications, but he also told the doctor he was willing to pay for them himself. Further, Plaintiff last saw his treating physician in December 2004. Yet he concedes he made $11,000.00 in 2005, after his alleged onset date. He and his wife also apparently had too much income or too many assets to qualify for SSI or for help with their utility bills. Although the undersigned sympathizes with Plaintiff's lack of insurance and his desire to not "get another bill started," the undersigned does not find that the ALJ committed reversible error by considering Plaintiff's lack of significant treatment or lack of any treatment for nearly two years in evaluating his credibility regarding his pain and other symptoms.

Plaintiff next argues that the ALJ erred by relying on an October, 2003, IME indicating that he was taking medication sparingly, noting that the IME took place prior to Plaintiff's alleged onset date, while he was still working. Although Plaintiff is factually correct, the IME took place only two months before Plaintiff's alleged onset date, and a year and a half <u>after</u> the injury that led to his alleged disability. He had been prescribed Bextra, Klonopin, and Lorcet, but took them only once or twice a week with good results. As already stated, he quit working only two months after this IME. The undersigned finds this IME relevant to Plaintiff's alleged symptoms and limitations. Further, the October 2003 IME was only a portion of a great deal of evidence the ALJ considered, which included two other consultative examinations that were performed on behalf of the agency

after Plaintiff's alleged onset date.

Plaintiff also argues that the ALJ erred by noting that Dr. Biundo found his studies "unremarkable," while Dr. Werntz reported, "upon review of the test results, that the Plaintiff's MRI examinations revealed herniated discs at L3-4, L4-5, and C5-6." (Plaintiff's brief at 14). Again, Dr. Biundo's report was one of several examinations the ALJ considered. As the Fourth Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)("This Court does not find facts or try the case de novo when reviewing disability determinations."); *Seacrist v. Weinberger*, 538 F2d 1054, 1056-567 (4th Cir. 1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion"); *Blalock v. Richardson*, 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

Dr. Biundo was an examining physician, as was Dr. Werntz. If there was a conflict or inconsistency between Dr. Biundo's and Dr. Werntz' reports, the ALJ was not only correct in resolving it, he was required to do so, and the court will not revisit his finding regarding same.

Finally, Plaintiff argues regarding credibility that the ALJ's analysis of his daily activities was in error, and that there "is no indication that any activity performed by the Plaintiff was performed on any type of sustained basis. In addition, the Plaintiff's activities are minimal, even less ambitious than those activities cited in Waters, supra." The daily activities the ALJ cited were that Plaintiff could plant a garden but not weed it, cooked using the microwave, could load the dishwasher, was an "avid reader," and was interested in trying to make money selling items on Ebay, although he was just beginning to learn how to use the computer. The ALJ also noted that Plaintiff

still did some work on his farm and had been looking for work at a lighter level. Most significantly, however, the ALJ noted Plaintiff's work as a Lead Carpenter for up to five months in 2005 (after his alleged onset date), for which he was paid over $11,000, representing more than SGA for an entire year. Although the ALJ says he gave Plaintiff the benefit of the doubt regarding whether he was actually performing substantial gainful activity during this period, he expressly stated he was not actually deciding that issue either way. The ALJ instead "assumed without deciding," that Plaintiff had not performed substantial gainful activity since his alleged onset date, mostly based on Plaintiff's own representation that his disability caused him to quit doing that job.[2]

Even if Defendant's Lead Carpenter work were not considered as substantial gainful activity it is still properly considered in evaluating the credibility of Plaintiff's subjective pain and limitations. Simply put, Plaintiff claims disability as of December 15, 2003, due to herniated discs, constant back pain, nerve damage, carpal tunnel, and tennis elbow. He worked after that date, however, full time, for up to five months continuously, ten hours a day, doing hard physical labor.[3]

---

[2]The undersigned notes that neither party fully addressed this "assumption without decision" made by the ALJ. The Appeals Council, however found as follows:

> The Appeals Council observes that you apparently performed substantial gainful activity earning wages of $11,559.12 in 2005. Such levels of earning show that you were able to perform substantial gainful activity. The Appeals Council finds that this work activity supports the conclusions reached in the hearing decision.

(R. 3).

[3]Also unaddressed is the up to one month of work as a carpenter that Plaintiff performed in January 2006 (although considered an unsuccessful work attempt by the agency)(R. 179); and his report of work from February 2003 to November 2005 in California doing "heavy civil construction," and from October 2006 to "present" in Maryland as a "General help carpenter." (R. 196).

In addition to all of the above, the ALJ was entitled to take into account, and did take into account Dr. Russell's diagnosis, which included "symptom magnification;" Plaintiff's report to a physician seven months after his onset date, that he remained independent in all areas; helped raise horses; and had "a lot of acreage at home and he was doing a lot of farming;" and Plaintiff's testimony that, only a few days before the hearing, he tossed a 60-pound bale of hay into a wagon. Regarding the latter, he said he was "trying to help her [his wife] get a few bales [of hay] so she could take them down to her horses," because his sons had not shown up. Although this activity "put [him] in bed for the rest of the day," the ALJ properly considered it as evidence that Plaintiff's pain and limitations were not as severe as he reported.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's complaints about his pain and limitations were not entirely credible.

### D.  Need for a Consultative Evaluation

Plaintiff also argues that the ALJ failed to properly develop the administrative record. "The ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). Here, Plaintiff argues that he was last seen by a treating physician in December 2004, "25 months prior to the date of the Administrative Law Judge's decision." (Plaintiff's brief at 3.) He notes that he testified he had no

insurance and that his condition was worsening, in that he had been having bowel symptoms for the last year prior to the hearing. (Id.). Plaintiff argues that this "evidentiary gap" and "inability to obtain treatment" made it incumbent on the ALJ to order a consultative examination. The undersigned does not agree.

Plaintiff filed his application for disability benefits in March 2004, alleging disability since December 2003. A consultative examination was performed on July 20, 2004, by Russell Biundo, M.D. (R. 232). Dr. Biundo opined that Plaintiff's x-rays, MRI and CT scans were "unremarkable." Plaintiff said Bextra, Zanaflex, and Neurontin were not helpful, but Lorcet was. At that time, seven months after Plaintiff's onset date, and four months after he applied for disability, Plaintiff "remained independent in all areas. He helps raise horses and he stays active as best as he can." Plaintiff ambulated without an assistive device and did not use any orthosis. He was not working and did not feel he could go back to his old type of work, but did "have a lot of acreage at home and he was doing a lot of farming. However, he is not going to try to do heavy farming any longer. He will try to go back to maybe light farming."

Plaintiff described his symptoms as his legs twitching a little bit and having a lot of pain and discomfort associated with muscles being tight and sore (R. 233). He had no difficulty with burning with urination, although he sometimes had frequent urination. He had no difficulties with bowel or bladder function. He denied any severe depression, anxiety "or anything like that."

Upon physical examination, range of motion of the cervical spine lying down was completely within normal limits as was passive range of motion (R. 233). Muscle strength was normal, reflexes were slightly decreased, more so in the lower extremities, sensation was intact, and he had no tremor or atrophy and no abnormal movements. Reflexes were normal. Lumbosacral spine range of motion

was within normal limits, with perhaps slightly limited range of motion in lateral flexion. He had a "tendency to feel tight across his thoracic and cervical paraspinals." Dr. Biundo assessed "most likely myofascial pain and suggested therapeutic intervention and conservative treatment." Plaintiff told Dr. Biundo that he would stay active, but did not think he would be going back to work. He said his muscles got really tight and sore, even from moderate activity. Dr. Biundo found Plaintiff was neurologically intact, with no evidence of cervical deformities of the thoracic or lumbosacral spine "at all." A Range of Motion form completed by Dr. Biundo indicated all ranges of motion were normal (R. 234).

A State agency physician subsequently completed a "Physical Residual Functional Capacity Assessment" on August 2, 2004, opining that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday, and had no other physical limitations.

Approximately one year later, in June 2005, another consultative examination was performed at the request of the agency, this one by Dr. Monderewicz (R. 232). Plaintiff told the doctor he had developed neck and low back pain in February 2000, when he was loading some heavy blocks at work. He was turning to put a block in a load and "felt a pinch at the base of his neck." He said he had x-rays of the lumbar spine but never had any of his neck. He tried to go to work but was unable to work the next day. He was put on bed rest and then physical therapy, and then returned to work until 2003, when he said "his employer told him that he was unable to work any longer because his neck and back problems prevented him from doing his job." Plaintiff said he had chronic low back pain but "most of his problems are due to the neck pain." It increased with turning his head or moving his head up and down. The pain was helped with heat. He felt frustrated because "even

though he feels his neck pain is more severe than the low back pain, prior medical evaluation has focused on lower back and he states he has never received any imaging studies of the neck, including x-ray, CT scan, MRI or myelogram and no EMG study of the upper extremities."

Plaintiff again reported no change in bowel habits, or urgency, frequency, dysuria or hesitancy in urination (R. 249). He ambulated with a left limp and held his neck very stiffly while ambulating and sitting. He was uncomfortable supine due to neck pain, but was comfortable sitting.

Upon examination, Plaintiff's shoulders, elbows, and wrists were nontender with no redness, warmth, swelling or nodules. Flexion and abduction of the right shoulder was normal, but the left shoulder was limited to 110 degrees flexion and 90 degrees adduction. All other testing was normal with the exception of positive Tinel and Phalen sign in the left wrist. Grip strength was 44 on the right and 23 on the left, but Plaintiff could write with his right hand and pick up coins with either hand without difficulty.

The dorsolumbar spine had normal curvature (R. 250). There was tenderness from L3 to the sacrum. Straight leg raising was normal both sitting and supine. He could stand on one leg at a time without difficulty. Forward flexion at the waist was limited, as was lateral flexion. There was no hip joint tenderness but Patrick testing was positive. Plaintiff had stiff, slow hip movement with complaints of pain. He could walk on his heels and toes and walk in tandem gait without difficulty. Squatting was decreased due to back pain. The doctor referred Plaintiff for x-rays of the lumbar spine which showed slight narrowing of L5-S1 (R. 153). She diagnosed chronic neck pain, chronic low back pain, and possible left carpal tunnel syndrome (R. 251).

A State agency Medical Consultant, Dr. J.T. Ruiz, completed a physical RFC of Plaintiff on August 15, 2005, finding that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently,

could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 255). He was limited to occasionally climbing ramps/stairs, stooping, crouching or crawling; frequently balancing and kneeling; and could never climb ladders, ropes or scaffolds (R. 256). He was limited to occasional overhead reaching and occasional handling with the left hand and frequent feeling with the left hand (R. 257). He could constantly handle and feel with the right hand, and finger with both hands.

In June 2005, Plaintiff reported no change in bowel or bladder habits to a medical doctor. Three months after that examination, in September 2005, Plaintiff went back to work as a Lead Carpenter, working 10 hour days of manual labor for three to five months. He had no special on-the-job restrictions, conditions, or help while doing this heavy work. He reportedly stopped doing that job sometime in November 2005. In early 2006, under "new illnesses, injuries or conditions" since his last report in September 2005, Plaintiff noted only that his "bowels and kidneys are acting up" (R. 173). This, along with Plaintiff's testimony in October 2006, that he had "problems with my bowels and stuff now," is the only mention of bowel/ bladder problems. On the other hand, the record indicates that Plaintiff had actually worked at a heavy labor job since his last consultative examination, earning over the limit considered substantial gainful employment for an entire year. He also rated his worst pain at only a five or six out of ten, stating he was in "terrible" pain if he lifted too much or worked too hard, as when he threw the 60-pound bail of hay for his wife's horses. The undersigned does not find this alleged "worsening" required a third consultative examination. Plaintiff himself was looking for lighter work. He said that construction employers told him they could not hire him because they had no light-duty work. Plaintiff was thinking of starting self-employment working at his computer selling on eBay. He himself testified he believed he could

perform this type of work once he learned how to use the computer. Plaintiff himself therefore believes he is capable of performing some exertional level of work. To his credit, he continues to try to do what he is skilled at- carpentry work. The fact that he cannot continue to do heavy labor does not mean, however, that he is disabled from all work.

Plaintiff also argues that a consultative examination was necessary to determine "the severity of his psychiatric condition," noting only that in April 2002, he was "reported to be in need of psychological services" and that in mid-2005, in his appeal, he noted under "new physical or mental limitations," that he had "Stress and depression of how to generate income and low self esteem d[ue] to not being able to survie" [sic] (R. 159-160). (Plaintiff's brief at 5-6). While true that Plaintiff underwent a psychological evaluation on April 3, 2002, the psychologists found he was in no significant psychological distress, and "it appear[ed] that he decided to stay at home and give up his work doing carpentry and . . . settled into a disabled lifestyle with basic needs met and he was unlikely to respond favorably to interdisciplinary treatment in general and he is in need of psychological services." There is no indication that Plaintiff ever sought any psychological services or even evaluation, despite the fact that he was employed and insured after that date. Plaintiff did not allege disability until December 2003, at which time he did not allege any mental problems. In July 2004, at a consultative evaluation arranged by the State agency, Plaintiff denied any depression, anxiety "or anything like that." In December 2004, Plaintiff did report to his doctor that he had been under a lot of stress "recently since his 17-year-old son was killed in a fight and he lost his newborn granddaughter to SIDS." The doctor prescribed Xanax "for his severe anxiety." There is no further mention in the record of these events or of anxiety. Plaintiff applied for disability three months later, without alleging any mental problems. There was no mention of any psychological problems during

the 2005 consultative examination. Significantly, Plaintiff went back to work after that date. His only reasons for leaving that job were physical. At the hearing, Plaintiff was asked if he had any problems other than with his spine. He responded that he had "problems with [his] bowels and stuff now," but otherwise had no other problems, and felt healthy.

Based on all of the above, the undersigned finds the ALJ did not commit reversible error by failing to send Plaintiff for a psychological consultative examination. The undersigned also finds that the ALJ did not fail in his duty to develop the administrative record.

### E. Vocational Expert Testimony

Plaintiff next argues that the ALJ erroneously relied upon the testimony of the Vocational Expert ("VE"). Plaintiff's argument is twofold: 1) the ALJ's RFC was flawed and 2) the VE's testimony conflicted with the Dictionary of Occupational Titles. Plaintiff concedes that the ALJ performed a function-by-function assessment of his ability to perform the exertional and non-exertional requirements of work, but argues that he "failed to set forth a narrative discussion setting forth how the evidence supported each conclusion, citing specific medical facts and nonmedical evidence. The Administrative Law Judge failed to identify the evidence upon which he relied to support his conclusions that the Plaintiff was limited to light work, needed to avoid ladders, ropes, scaffolds, stairs, and ramps, could perform postural activities occasionally, would need to miss one day per month, and was limited to no more than occasional grasping and fine fingering with the left hand." (Plaintiff's brief at 8). Plaintiff cites SSR 96-8p in support of his contention. SSR 96-8p provides, in pertinent part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing

> RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

A review of the ALJ's decision shows he complied with the Ruling. He discussed the medical facts and nonmedical evidence that supported his RFC. He also considered inconsistencies and ambiguities in the evidence. His decision includes a narrative discussion of how the evidence supports his conclusions. The undersigned finds the ALJ's decision in this regard sufficient.

Plaintiff also argues that the ALJ "ignored pertinent evidence," such as: Dr. Shafiei's report on December 9, 2004, that Plaintiff had severe pain in his left shoulder with markedly limited range of motion (R. 245); Dr. Monderwicz' report in June 2005, that Plaintiff limped on the left and had stiff, slow movement with range of motion of the hip; and "although the Plaintiff's primary complaint is neck pain and an MRI examination, although dated, demonstrated a herniated disc at C5-6, the ALJ failed to make any findings related to the Plaintiff's neck impairment." Plaintiff concludes: "Here the Administrative Law Judge has failed to[] provide any explanation for his implicit rejection of the Plaintiff's neck impairment, shoulder impairment, and left hip and leg limitations."

First, the undersigned finds the ALJ did not "ignore" evidence regarding Plaintiff's neck, shoulder, hip and leg. He discussed Plaintiff's statements and testimony as well as the medical evidence regarding these conditions. The December 9, 2004, report states that Plaintiff complained of severe pain in his left shoulder, pain radiating from the left side of his neck to his left hand, and increasing weakness of his left hand starting only a few weeks earlier. Dr. Shafiei found Plaintiff's

range of motion markedly limited at the left shoulder, and his left shoulder girdle muscles were tender to the touch. He diagnosed "rule out cervical radiculopathy." Again, Plaintiff sought absolutely no treatment or evaluation after that date. He worked for up to five months, full time at a physical job as Lead Carpenter after than date.

Further, the ALJ noted an MRI of the cervical spine indicated a small transverse herniation with mild compression and mild narrowing of the spinal canal. He also noted Dr. Biundo's examination which revealed normal range of motion of the cervical spine and upper extremities, no limitation of range of motion of either of Plaintiff's shoulders, normal grip strength and normal upper extremity strength.

The ALJ also discussed Plaintiff's alleged hip and leg limitations, including Dr. Monderewicz's report that straight leg raising was negative, and significantly, that "apparent motor weakness of the left lower extremity should have involved more upper level nerve root of the lumbar spine." Deep tendon reflexes were normal and symmetric to both lower extremities, there was no evidence of muscular atrophy and no findings of upper motor neuron deficits. Plaintiff could walk on his heels and toes, perform tandem gait without difficulty, and stand on one leg at a time.

All of the above substantially supports the ALJ's determinations regarding Plaintiff's hip, leg, neck and shoulder impairments.

Finally, as regards the Vocational Expert testimony, Plaintiff argues that that testimony conflicts with The Dictionary of Occupational Titles, Fourth Edition 1991 ("the DOT"). The ALJ asked the VE the following hypothetical:

> If we assume a person of the same age, education and work experience as the claimant in this case, but assume a person who's limited to doing, say, light work as that's defined, meaning no lifting more than 20 pounds up to a third of the day, and

no lifting more than ten pounds two-thirds of the day, and then standing and walking a total of - - total, about six hours in a day, but not all at the same time. But, we also would have to have – allow the person to change positions briefly. And by briefly, I mean, just for a minute or two, at least every half hour. So, if a person is sitting they should be able to stand and move around every half hour for a minute or two. Or, if a person is walking or standing, they should be able to sit every half hour for a minute or two to take the load off their feet. There'd be no, no climbing ladders, ropes, scaffolds, stairs or ramps. No more than occasional balance, stoop, kneel, crouch or crawl. Assume there'd be no more than occasional use of the left hand and arm. And when I say left hand and arm, I mean the non-dominant hand and arm, for grasping or fine fingering. Would there be any jobs such a person could do, including any of the past jobs?

(R. 65).

The VE replied that there would be no past jobs, but the hypothetical individual could perform the jobs of information clerk, inserting machine operator, and photographic machine operator, at the light level. He also testified that those were only a sample of the jobs that would be available. Social Security Ruling ("SSR") 00-4p, requires the ALJ to ask the VE if the VE's testimony conflicts with the DOT, and then to resolve any such apparent conflicts. Here the ALJ first advised the VE that "the Dictionary of Occupational Titles is the primary reference work we use in our decision making, so you need to make sure your testimony is consistent with it. And, if there's any disparity between your evidence and the DOT, you need to apprize us of that. Will you undertake to do that?" To which the VE responded, "Yes, I will, Your Honor." After the ALJ recited the hypothetical, and the VE named a significant number of jobs in response, the ALJ asked the VE if his testimony was consistent with the DOT. The VE replied that it was. There was no "apparent conflict" between the VE's testimony and the DOT, and Plaintiff's counsel raised none at the hearing.

Plaintiff argues that the job descriptions for information clerk, inserting machine operator, photographic machine operator, plastic design applier, laminator, and type copy examiner, the jobs

identified by the VE at both the light and sedentary levels, require frequent to constant handling and fingering beyond Plaintiff's abilities. Plaintiff attached job descriptions for those jobs which, as he asserts, do include a requirement of frequent to constant handling and/or fingering. The hypothetical to which the ALJ responded, however, had a limitation only on occasional grasping or fine fingering of the left, non-dominant hand and arm. Significantly, the DOT's description of these jobs does not require bilateral grasping or fine fingering – it mentions only grasping or fine fingering. Thus, there is no "apparent conflict" between the VE testimony and the DOT. Although the undersigned could find no Fourth Circuit case on point, the Fifth Circuit has addressed the issue. See, i.e, Carey v. Apfel, 230 F. 3d 131 (5th Cir. 2000), regarding a case in which the claimant's left hand and forearm had actually been amputated. The Fifth Circuit first noted:

> What is involved here is merely an alleged conflict between the vocational expert's specific testimony that Carey could perform the jobs of cashier and ticket seller with one hand, and a DOT description stating that the person in those jobs will be required to have some ability to finger and handle things. The conflict identified by Carey does not even become apparent until the further inference is made that the jobs require manual dexterity with, not one, but two hands. Moreover, that conflict is greatly mitigated by the vocational expert's specific testimony that Carey could perform the identified jobs with only one arm and hand. Carey nonetheless maintains that the vocational expert's testimony should have included some explanation of whey the identified jobs could be performed with only one arm and hand.

> We are not persuaded that the facts of this case present any actual conflict between the vocational expert's testimony and the DOT. The DOT does not contain any requirement of bilateral fingering ability or dexterity, and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm and hand . . . .

> Given the tangential nature of the conflict alleged here, we surmise that Carey's argument actually reduces to a factual disagreement about whether a person with one arm can perform a job requiring some degree of manual dexterity and fingering. The regulatory structure as well as the controlling precedent requires expert testimony on such issues, and there is no indication in this record that the vocational expert's testimony that Cary could perform those jobs with one arm and hand was incorrect.

Our task in these cases is merely to determine whether the Commissioner's determination is supported by substantial evidence. We are not permitted to "reweigh the evidence in the record, try the issues de novo, or substitute" our own judgment for that of the Commissioner, or even the testifying witnesses. . . .[4]

In Diel v. Barnhart, 357 F.Supp.2d 804 (2005), the Eastern District of Pennsylvania similarly found:

Although the DOT indicates that many of the types of jobs identified by the VE require frequent or constant reaching and handling, and in some cases fingering, it is not clear to the Court that there is a conflict between the VE evidence and the DOT. The fact that a job requires reaching, handling or fingering does not necessarily mean that Plaintiff is incapable of performing that job since in some cases he may be able to satisfy the requirements of the job by reaching, handling, or fingering with his left hand with occasional assistance from his right hand. In this context then, the Court concludes that no material conflict exists between the DOT and the VE evidence, which assumed that Plaintiff could perform some cashier, security, packing, food preparation, usher, or attendant jobs.....

The undersigned finds that in the present case there is no actual, material conflict between the VE's testimony in Plaintiff's case and the DOT. The ALJ specifically included in his hypothetical to the VE a limitation on the use of the left, non-dominant arm. The VE then testified that a significant number of jobs would exist in the economy with that limitation in combination with the others named by the VE.

The undersigned therefore finds that substantial evidence supports the ALJ's reliance on the testimony of the VE regarding the availability of a significant number of jobs that could be performed by the hypothetical individual with the limitations named by the ALJ.

## V. CONCLUSION

Based on all of the above, the undersigned United States Magistrate Judge finds that

---

[4]Although Carey was decided before SSR 00-4p was effective, the Fifth Circuit has since approved the reasoning in that case. See Jasso v. Barnhart, 102 Fed. Appx. 977 (5th Cir. 2004); Haas v. Barnhart, 91 Fed. Appx. 942 (5th Cir. 2004).

substantial evidence supports the Administrative Law Judge's determination that Plaintiff could perform work at the light and sedentary levels that existed in significant numbers in the economy. The undersigned therefore finds substantial evidence therefore also supports the Administrative Law Judge's conclusion that Plaintiff was not disabled at any time through the date of his decision.

## VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 11] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 8] be **DENIED**, and this matter be **DISMISSED** from the Court's Docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable John P. Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **23** day of *April*, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE